The next case to be argued, I believe, is United States v. Multistar Industries. This case is set for 20 minutes per side, and so if you'd like to make a rebuttal argument. Yes, I do, Your Honor. I would like to reserve five minutes of my time for rebuttal. Okay, watch your time yourself. It will be your responsibility. All right. I will take heed of that. Thank you very much. We'll try to remind you. I appreciate that. Thank you, Your Honor. Good afternoon. If it pleases the Court, my name is David Rubino, Counsel for Appellant, Multistar Industries. The matter before the Court is one of regulatory interpretation, namely, whether Multistar reasonably believed that they were exempt from regulations issued by the U.S. EPA pursuant to Section 112R of the Clean Air Act and Section 312 of the Emergency Community Right to Know Act during the temporary storage incident to transportation of rail cars owned and operated by Eastman Chemical Company that contained trimethylamine, a hazardous material, otherwise known as TMA, also manufactured by Eastman prior to the time that the TMA was transloaded from rail cars into the tanker trucks. Counsel, if I could interject. Yes. A question, please. Before you get into your statutory and regulatory arguments about the exemptions, could you just please explain what would be the harm to the public if this TMA material, the hazardous material, had leaked? Well, there's no question that if the TMA leaks, it is a hazard to the public. I mean, it's the reason why it is regulated. And it's regulated predominantly under the Department of Transportation regulations. So the rail cars that contain it have to have specific safety features and be specifically designed in order to be able to contain and hold the TMA while it is in transportation. Okay. Thank you. Multistar operates a transloading operation in Othello, Washington. Transloading, in case someone doesn't know, is a transfer of material from one bulk container, transportation container, into another. So in this case, from a rail car into a tanker truck. The purpose of Multistar's transloading operation was to facilitate the shipment of TMA that was manufactured and shipped by Eastman Chemical from Eastman's facility in Pace, Florida, to Eastman's customer in Moses Lake, Washington. 112R regulates stationary sources. EPCRA 312 regulates facilities. Rail cars are not expressly included in the definition of stationary source under Section 112R, nor in the definition of facilities under EPCRA. There is also no definition for the word transportation in the regulations, nor the phrase storage incident to transportation, nor do those regulations contain any expressed time period when a transportation would otherwise be deemed stationary for purposes of the regulations. None of this is disputed by the government. Notwithstanding this, the district court found that a plain reading of the regulations was unambiguous. It held the regulations applied to Multistar's operation and that Multistar was in violation of them. The court did so, however, only after it inserted what is known as a motive power exception that it gleaned from the 1998 preamble to the 112R regulations and by inserting an active shipping papers exemption under EPCRA, which is also not contained in the regulations. Let me ask you about the standard of review because we're here on de novo review, correct?  But then the question is how we look at the agency determinations. And in the interim between when your case started and when the Supreme Court arrived at the Loper-Bright case, there's been some change in the landscape. Some would say cataclysmic change, but there's a change. There has been, yes. In the legislative and regulatory landscape. So my question to you is with respect to Auer and Skidmore, don't they still apply? And what deference in your view do we give to the EPA's view in this case? So Loper-Bright did not, for lack of a better term, kill Skidmore, Auer, and the like. Correct. I think a couple of the justices gave pretty clear indications that they would want to. Maybe those are next, but they're not here yet, right? Exactly. However, even under those, the agency is only entitled to deference if in fact it is regulating an area that is within its sphere of expertise. And our view is what the EPA tried to regulate here is beyond its sphere of expertise. That's the expertise of the Department of Transportation. So our view is regardless of the fact that Kieser remains on the books, it can be applied and still uphold the ruling that we are seeking because EPA is trying to regulate in areas that are beyond the expertise of the agency. Why would a stationary source be within Department of Transportation's expertise and not the EPA's? And I guess a related question is how long should a transportation container be stationary before, I guess before, in your view, it would fall out of the ambit of the Department of Transportation? Well, let me answer the second part of your question first. Okay. Thanks. If EPA wants to regulate railcars as stationary sources, EPA has the ability to do so. They need to put it in the regulations. They need to be clear about it. And in terms of the timeframe, if there is a timeframe within which they want to let the regulated public know that if you leave a railcar standing for a certain period of time, it will be deemed stationary, that too is within their purview. They simply need to enact regulations to do it. They attempted to do so while this appeal was pending and in the end elected not to insert any time period whatsoever. So a reading of the regulation gives you absolutely no idea how long a railcar can sit before it would be deemed a stationary source. Would you have to use some common sense there when you're saying, well, it's in what, it's still in transit forever? Can it stay there forever as an intransitor in transportation? Well, let's take the exemptions that EPA seeks to apply. Their motive power exemption says if a railcar remains attached to the motive power that brought it, it's exempt from the regulation. There's nothing that requires that motive power or the railcar attached to it to be moved. So it could stay there one month, two months, a year if it was attached. But if what you're looking to address is the risk of that railcar being there, that motive power exception makes no sense, which is only evidence that the EPA is trying to regulate an area it doesn't fully understand. If you need those railcars moved or if you want attention paid to the railcars, then enact a regulation that says you need to do that. EPA has not done that here. So I want to just ask, in this case, do you think we're interpreting the legislation, the Clean Air Act, or the regulation? Well, to the extent that you're interpreting stationary source under the statute or facilities under the statute, then clearly Loper-Bright would say there's no deference given to the agency and you are interpreting. Well, not none. I mean, you can look at. True. That is true. Okay. But, yes, you would be looking at it and the court would be interpreting it as the court believes appropriate. In the context of the regulations, which is where the transportation and storage engine transportation exclusions apply, that would be done under KESER, and the agency is only entitled to deference assuming they are regulating in an area where they have the requisite expertise. And our view is they don't. I mean, EPA does. Their argument was we regulate mobile sources. We know how to do that. That's true. But you regulate what the emissions limits can be from a tailpipe. You regulate what the emissions limits can be from a truck. But you don't regulate the safety features of the truck and you don't regulate the safety features or how the engine accomplishes the emissions limits you want to achieve. So EPA's expertise in that regard is to ensure air quality so they set emissions limits for parties to meet. That makes sense. But here, all due respect to the agency, they're out of their element when they're trying to regulate the safety features of how to safely transport hazardous materials in interstate commerce. One of the things you just mentioned earlier is that you didn't think this motive power made a lot of sense, but the government had made the argument that you somehow forfeited that argument. Would you respond to that? Oh, I don't believe we forfeited the argument whatsoever. I think what the government argued is that we forfeited a rolling stock argument. Okay, maybe I misunderstood that. No, no, that's fine. I don't believe we forfeited that either, but we certainly did not forfeit the motive power argument that is replete through our briefing. Just so I understand your position on this point, do you believe the Department of Transportation would still be able to regulate these rail cars while they're on the private siding, or is your argument that nobody can really regulate? Our argument is that the Department of Transportation, in fact, does regulate them, because as long as those rail cars are placarded, which they are, then they're required to be in compliance with all of the safety requirements of the Department of Transportation. The transloading operation itself is also subject to Department of Transportation regulations, not EPN. So it is clear the transloading is separate unto itself. It is not connected to any other stationary source or any other facility. So it is just literally, it is a device. You hook up the rail car, you start the transloader, and you hook it up to the tanker truck, and you – I don't know the full mechanics of it, but, you know. It goes from there to there. Somebody presses the right buttons, and the TMA is safely transferred from the rail car into the tanker truck. But in this notion of in transportation has to mean something, and could it mean forever? Well – I mean, that's really the – I realize that's the far end, but what if somebody forgot and got displaced and it was forever? Is that in transportation? Well, if it's – one could argue if it is left and forgotten about, then it's probably heading towards a place where it isn't. But that's not the issues we have here. This TMA, when it arrives at Multistar, the only purpose for it is to be transloaded for final shipment to Moses Lake. So in terms of – Well, that's the purpose, but that doesn't necessarily have to – with all respect, it doesn't help me try to understand what does in transportation mean. Right. That's why I asked how long. How long? Well, once again, I guess I would put it back. It's not upon the agency to tell people how long they want that to be. If they want to put a limit on it, then the agency can regulate that, and they can say no more than three days, no more than a week, no more than a month. Well, they can, but they haven't, and so that's – You know, we're always in the situation where an agency doesn't tell you every jot and tittle of the whole world, and that's why we have ours, Gidmore, and now Locor Bright. So if they make a determination that it's not – if it's in storage at some point or the other, not in transit, why would they have to have a regulation that says, well, it ends after a week or it ends after two weeks? Because you need to – That would be nicer, but is it required? It certainly would be nicer, and I would argue that, in fact, it really should be required because if you're going to impose obligations on the regulated community, the regulated community should be able to read the regulation and have a fairly clear idea of what it is they need to do and when they need to do it. I mean, by analogy, I drove up here from Portland yesterday, and along I-5 I went through different areas that had different speed limits. The speed limit signs didn't say, don't speed. No, they had very specific numerics. Are you still in transit? I'm not anymore because I got – But during the time that I was, the point just is it was very clear what the rules of the road for me were. I knew exactly how fast I was permitted to go, and if I went beyond it, that was at my own risk. But if it had just said, don't speed, there's no context. I really don't know what it is. That's kind of – Montana used to have that where they didn't want you to speed, but they didn't have a speed limit yet. Yeah. So the point is, I mean, we're dealing with serious materials. There's no question about it. And to the extent the agency wants to address the risks that are involved in moving these materials, more clarity is better than less, and they should be able to give clear guidance to those who are engaged in the enterprise, what they need to do and when they need to do it. But more to the point, if they're not going to give that level of guidance, then if they're going to turn around and in a first-of-its-kind enforcement action against a transloading facility, then they should be a little more reasonable with the way they're going to try and penalize and enforce against the party because there's really no fair notice there. And regulations are meant to give fair notice to the regulated entities what they need to do. And in this case – What do you think – or what do you think we should do and interpret this 1998 preamble and 2000 guidance document? Well, it depends on how you end up viewing the language of the regulation. If the regulation is, in fact, unambiguous, then you read the regulation as written, and the words say what they are and you enforce the words as they're to be enforced. If you do that, there is no railroad cars in the definition of facility. There's no railroad car in the definition of stationary source. There's no definition applied to transportation or what is incident to transportation. And if you're going to look at the preamble, you can certainly look for some level of guidance and interpretation. But I would posit what shouldn't be done is the importation of a specific criteria into a regulation that didn't make it in the language. It's one thing to say this is what we think and this is what we want. It's an entirely different thing if you don't write it down. But they do? By some outer limits because it says on this motive power that if it remains attached, then it's still in transportation. So that is some guidance, right? Potentially, but then no guidance on what I need to do with it afterwards. And there's nothing within that. If you unhook it, then we know it's not in transportation anymore, right? It's kind of a binary formula. Well, yes, that would be a binary formula. Then the question is whether it's reasonable for them to be regulating that way in an industry that they don't otherwise have expertise in and whether it is even feasible to accomplish that type of regulation as they're positing. I know you wanted to save five minutes. You're down to 3.15. I'll leave it to Judge Gould as to whether to give you a little bit more on rebuttal. Well, no, with that, I'll reserve my time unless you have any other questions, and then I'll be happy to come back. Thank you. Thank you very much for your time. Good afternoon, Your Honors, and may it please the Court. David Frankel on behalf of the United States. When Multistar warehoused up to ten railcars full of extremely hazardous TMA on its private track, it was not engaged in storage incident to transportation that would be exempt either under the Clean Air Act's Risk Management Program or under EPCRA, statutory programs designed to protect workers, communities, and first responders from the risks of hazardous chemicals. The text of the similarly worded exemptions confirms that storage is incident to transportation only if it occurs during and is a subsidiary part of the act of transportation, and all the indicia here that are plausibly relevant to that analysis point in the same direction. The TMA-filled railcars were not in transportation and were not performing exempt storage incident to transportation, and I'll go through some factors here. Multistar held the TMA for weeks or months at a time, more typically months. They were held in immobile railcars that had chocks by the wheels to prevent movement. Let me just stop you at the first factor. You mentioned that they were stored for weeks or months. How dispositive is that? What if it had been a day, two days, removed from motive power? Would that change the analysis? Sure. I mean, the analysis is different. What I'll say is that EPA has this motive power rule. That is sort of the touchstone and the guidepost that they use for implementing this. It's sort of a safe harbor, that if an entity is storing it and it remains connected to motive power, at that point the entity, I think, can claim exemption. EPA has advised that they will not enforce against that entity, at least absent some very unusual circumstance. Barring that, there is some de minimis amount of time. If there is a switching of railcars just for a second, EPA would exercise its discretion not to enforce. If there was some trouble that caused disconnection for a brief period of time, EPA would exercise its discretion likely not to enforce. But by providing this motive power interpretation, what they've done is provide a pretty clear signal to the regulated community about a test where you're on one side or the other, that this is really the central guidepost that EPA uses in understanding it. And so, you know, if it were some really de minimis time, the analysis could well be different. I think that's a harder case. But what you have here is you have something that is so far on the other end of the spectrum. Go ahead. I think a big argument made by Multistar is, well, we're even talking to the wrong agency. You know, we're under the Clean Air Act. We're regulating air. And the EPA doesn't have experience or expertise if you unplug the power and then it's stationary there. What happens? They say, you know, there's no guidance. I mean, I think we would dispute that. It is true that the Department of Transportation regulates the hazardous chemicals while they are in transportation. But even under the DOT regulations here, it is clear that hazardous chemicals sitting in stationary rail cars on private track are not in transportation. That is not a function that DOT regulates. That is not storage that would be within DOT's purview. And it's EPA that's the agency that's charged with preventing accidental releases when hazardous chemicals sit for extended periods at stationary sites. And that's exactly what's happening in this case. You know, EPA isn't trying to tell Multistar how to build the rail cars or how the rail cars should travel along track. But what EPA is saying is that when rail cars are stored at a facility for extended periods, that storage at stationary sites is exactly what EPA was charged with regulating. The EPA is charged, directed by Congress, to prevent accidental releases from stationary sources. And here, where you have chemicals sitting for long periods in immobile rail cars that are disconnected from mode of power, that are not covered by any active shipping papers, all of the indicia show that this is not in transportation. What is your response to Multistar's argument that this mode of power factor is basically irrational because you could have, I guess, a rail car connected to mode of power, sit on the siding for months or for years, and I guess that wouldn't be problematic for the EPA. But if it's there for a week, not connected to mode of power, that is a problem. I mean, the problem with any sort of bright-line rule is that, sure, it can be gamed. I mean, if an entity wanted to keep some car hooked up to mode of power and then try to argue in court that even though it sat for a year or two years, it should still be exempt to mode of power, I mean, so be it. But the fact is, I think it's a good proxy here. What EPA is trying to do at the mode of power test is it's saying, like, what is the key function of transportation? And the key part of transportation is whether something is moving or not. I mean, those words are largely synonymous, and transportation has to entail movement. And so at the point where a rail car is disconnected from the mode of power source that gives it the capability of movement, that is just a very strong proxy. The EPA felt would give very strong guidance to the regulated community in a fairly simple way about how they should understand whether they would or would not be subject to enforcement action. I mean, I will say that, you know, we do ask this court for deference, but that is really our secondary argument. I mean, our primary argument is that the Clean Air Act risk management regulation at issue here and the EPCRA statute at issue here are unambiguous. They're really whatever factors you think could plausibly go into that analysis, that all of them align in their circumstance. If you look at the length of time, if you look at whether the rail cars were connected from mode of power, if you look at whether they were subject to active shipping papers, all of those point to the same direction, which is that this was not in transportation or being stored incident to such transportation. And storage here was really plainly, it was a principal purpose of Multistar's business. I mean, Multistar wasn't just, you know, taking in these rail cars, hooking them up to a translator and sending them on their way, but Multistar had contracted to operate a regional TMA storage depot to serve Eastman's needs. It agreed to serve as the warehouseman of Eastman's TMA inventory in exchange for a daily storage fee. And from what do we divine or derive the definition of stationary source? Well, you start with the statute and the Clean Air Act here. I mean, so this is the Clean Air Act risk management program. Start with the statute, and the statute is very broad. The statute says any equipment, structures, et cetera, from which an accidental release may occur. And so clearly that comes within the statute. Clearly, you know, stationary rail cars are stationary equipment or stationary structures from which a release could occur. And then you go to the regulation, and the regulation, I think, adds some clarification and actually narrows the definition a little bit. So it does confirm, it confirms that transportation containers like rail cars can be part of a stationary source, I think are presumed to be part of a stationary source, but if they are in transportation and performing storage incident to transportation, they are outside of that. So I think you start with the statute, which is very broad, and then you go to this regulatory definition, which gives you a little bit of clarity and I think narrows it. You know, I do not think this is a case where you can get around the regulation, because this is a case where the appellants here are relying on that regulation. They are relying on that transportation and incident to transportation exemption. They're not saying that's, you know, not within the statutory definition. They really have to use that to get where they want to go here. And once you're in that world of the regulation, I think the text shows, first, that something can be stored incident to transportation only if it occurs as an activity that itself qualifies as transportation. And, again, when you're talking months on end stored in immobile rail cars, you're out of that universe. And I think the history and purpose here are also illuminating. Counsel, can I interject with a question? Assuming for sake of argument for a moment that the regulation should not or does not apply, could the EPA be affirmed here based solely on the statute, on the Clean Air Act? Yes. I mean, I think the Clean Air Act is broad and it has some limitations. I think it has to be stationary. It has to be equipment or structures. It has to be capable of an accidental release occurring. And so it meets all of the statutory factors. I haven't heard an argument from the opposing side that it doesn't fall within the basic statutory definition. I think they need the regulation. I think they need the regulation to try to claim that what they're doing is, in fact, exempt from the requirements of the risk management program. But they also haven't challenged the regulation. Actually, they couldn't challenge the regulation because they can't contest the validity of an RMP regulation in an enforcement proceeding. They would have had to bring a timely petition for review in the D.C. Circuit to do that. They haven't done it. So I think we are in a world where the regulation clearly applies and governs in this case. And I think the history and purpose is also really illuminating. So as with the statute, when interpreting a regulation, you look to largely the same set of tools. And history and purpose are two of those central ones in determining what a regulation means, whether it's ambiguous. And here, what the history shows is that EPA considered and rejected proposals to categorically exclude all transportation containers when it drafted the exemption. And instead, it adopted the current language precisely to confirm that a container, like a rail car, would not be exempt if it remained immobile at a location for an extended period, and thereby posing the exact same hazards as any other stationary storage container. I mean, in some sense, it's not so different. Whether hazardous materials are stored for extended periods in a rail car or a shipping container or a vat, in all of those situations, they come within the basic purpose of the risk management program in EPGRA, which is making sure those who work with it, the surrounding communities that are exposed to it, and the first responders who would respond to an accident are adequately informed and reducing the risks here. And this is – You made a statement a moment ago about they need the regulation in order to then invoke the exemption. That's right. But you also said it's too late to challenge it at this late date in this proceeding. But is that absolutely true under the Supreme Court's new corner post rationale? So forgive me for not brushing up on corner post. I think corner post is about the statute of limitations. Oh, yeah, wait. When you get challenged. When you get challenged. And they're basically saying, well, only when you're impacted. Yeah. And they're now saying, now I'm impacted. Right. So our argument is that you cannot challenge the validity of an RMP regulation as a defense to an enforcement action. And that is – that's clearly from the statute. There's a footnote we have in our supplemental brief that notes that. But the way you have to challenge it is by petition for review in the D.C. Circuit. So they're in the wrong – so putting aside timeliness, I mean, they would be in the wrong court to challenge the validity of the regulation. And I don't think they have. I mean, it's also an argument that's been forfeited because it simply hasn't been presented here. I mean, there is no argument that we should disregard the regulation, which has the exemption language that they hang their hat on, I think because they need it for their case to prevail. So, I mean, one thing I will say from hearing opposing counsel's argument here is that I still haven't heard what their interpretation is. I mean, there's a lot of saying this shouldn't be the rule or that shouldn't be the rule or EPA should have been more clear. But the fact is we're dealing with language in a regulation in a statute. And we think that all of the indicators that you could plausibly look to to determine whether those apply in these set of facts all point in the same direction. And I'm still not clear what their theory of the case is. I mean, I am not clear what exactly they think the rule should be about when something is incident to transportation or not incident to transportation. Other than that, they don't like the tests that EPA has applied or they don't think the factors that would weigh against them in this case should apply. And, you know, I think at the top... Is it their job to tell you what the regulation should be or what the parameters should be as opposed to saying as applied, we got the statute, we got the regulation, and they're not sufficient to tell us what the parameters are? Well, I think it's their job to tell this court what those things... I mean, they think if they're here and saying that a statute unambiguously weighs in their favor, then they should be able to say what that unambiguous reading is that that weighs in their favor. And I still haven't heard that. I mean, I think they conflate that a little bit with the idea of notice. Again, I don't think they ever raised any sort of due process argument or notice argument. I think it would be well forfeited at this point. But the fact is that EPA announced that it would use motive power as a central guidepost for enforcing the regulation decades ago, that EPA has issued guidance documents consistently informing the regulated community of how it would approach these sorts of cases, and that there is a history of EPA enforcement actions over the past decade or so where EPA has enforced in exactly these circumstances that entities that were storing hazardous materials in rail cars disconnected from motive power on private track is exactly the situation where this does apply. And had they done adequate diligence here, they would have been well-informed from statements in the Federal Register, guidance, and from enforcement history. And the fact is, once they did ask counsel what they should do, counsel advised them to comply in this case. You know, that fades a little bit into an argument that they've made about the appropriate scope of the penalty here, and their claim that they never had notice. But even setting aside all of those factors that should have put them well on notice of how the statute would be enforced, even after EPA said that they were violating the statute, they continued not to comply. They submitted an incomplete and inaccurate initial risk management plan, and when they were advised of deficiencies, Multistar simply put its foot down and decided they refused to comply. And even after the district court rejected their legal theories, they continued to not comply. So I really think the notice argument is a bit of a red herring to any of the arguments presented here. You know, I'm happy to answer any further questions this Court has about the application of the statute. I will just quickly, you know, turn to the civil penalty idea, and just to say that the Court considered all the required factors here and was well within its ample discretion to select an amount that was about one-tenth of one percent of the statutory maximum in this case. The Court has no further questions on that. I'm happy to cede my remaining few minutes. I mean, I think it would be helpful for me at least to hear in rebuttal what exactly the interpretation is that appellants are offering, where none of the indicia that we think matters, where the motive power is out the door. What does matter? Because it's hard to imagine a test where, in the unambiguous language here, they are in transportation or performing storage incident to transportation. You're reading my mind. I just had written that down. Perfect. Thank you. Thank you. Thank you, counsel. I don't hear questions from the panel. So we'll go to rebuttal argument by the appellant. Thank you. With only three minutes, 14 seconds, I'm going to try and speed through as much as I can. Well, it's an important case, a difficult case, so why don't you take five minutes? Thank you, Your Honor. I greatly appreciate the extra time. I would be willing to begin with my question, which somewhat dovetails with the government's, and that is from the plaintiff's perspective, what is the unambiguous reading in your favor? That is exactly where I was going to go, Your Honor. The unambiguous reading is reading the regulation, and it says that it doesn't mention rail cars, and it says items in transportation are exempt, including storage incidents transportation. As to multi-star, this arrangement was a continuous shipment from Pace, Florida, transloading in Othello, Washington, for final delivery to Moses Lake. That was the transaction. This was always in transportation. And the plain reading is you read the regulations, and the regulations don't say any particular time. The regulations don't list the mode of power exception, and according to the government's counsel, the burden is then on my client to not just read the regulations that they can pull up, but to then go back in history and be reading 1998 preambles and 2000 guidance. And that just sort of flips it on its head, to be perfectly candid. If the government wants something, including a mode of power exception, then put it in the regulation. Make it clear. Make it easy to see, because if anyone's looking in theory to game the system, that's more where the government's going. Essentially what they've said is there are times when, well, we see it as a safe harbor. We'll use our discretion, and we won't enforce it here, and maybe we won't enforce it there. But what they're not telling you very clearly is, okay, so when are you going to enforce it? And that's what the regulated community is entitled to know. When will you enforce this against me? Is it going to be the moment I disconnect? Because if it is the moment I disconnect, then be consistent and make sure that you enforce against everybody the moment they disconnect. But if you don't do that, then that bright line isn't the guidance to anybody. What we get to is the government deciding when and if they want to decide to enforce, and that means you're going to have inconsistency, and that's not the way these regulations are meant to be enforced. Moreover, to the point of have they enforced against transloading operations, they've cited basically three cases, two out of Region 1 and one which is a North Carolina state case. Let's discuss the federal enforcement, both out of Region 1 out of Boston. One case is in 2014, so predates when Multistar started. The other is 2021, and it happened afterwards. In both cases, those railcars were physically connected to an anhydrous ammonia facility. So the railcars were formally connected to a stationary source. There was no dispute, and Multistar will not dispute that if those are the circumstances under which you want to enforce, statute gives you the right to do it. These railcars were never connected to any stationary source. The cases they cite are inapposite. What makes it even worse, they obtained an $850,000 penalty. This is a level three facility to them, the most risk. They never once have gone down to inspect the transloading operation, not once. These other facilities that they cite out of Boston, those were both subject to physical EPA inspections where the EPA inspectors were on site, observed things, observed physical defects with the equipment that was there. And in one case, $114,000 penalty and come into compliance with statute. In the other case, $305,000 penalty, come into compliance with the statute. But at least it was based on real evidence. You had people who went there and observed defects. Region 10 has not seen fit to send its inspectors out to go look at this facility. That's wrong. That's not consistent. That is not the way the government should be enforcing regulations. In terms of the incomplete RMP, we would actually posit that the RMP is complete. And the EPA is the one that's saying it's not. Well, maybe it's because they haven't visited the site to actually look and see what they're talking about. But this is a legitimate dispute about whether or not the risk management plan is complete or not. It is not a question of not being in compliance. It is a question that we technically disagree with the agency. And if the agency's position carries the day, that means you may not do that. And that is wrong. With that, unless you have any other questions, I will lower my temperature and I will take my seat. Thank you, counsel. This case shall now be submitted. I thank counsel on both sides of the case for their excellent arguments. I also want to thank Dean Lawson and the UW Law School once more for generously hosting. Lawson inviting us here to hear the arguments. With that comment, I'll again say thanks. And the court will adjourn for the day. My understanding is that our law clerks will remain to talk with the students. And then some of us will come back after taking off our robes, etc., and also talk with the students and entertain questions. And, of course, you can imagine we won't entertain any questions about today's cases. So thank you.
judges: McKEOWN, GOULD, THOMAS